IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | Case No.: 24-CR-182 (TJK) |
| v. | 18 U.S.C. § 1752(a)(2) |
| **LARRY FRELIGH,** | |
| Defendant. | |

### STATEMENT OF OFFENSE

Pursuant to Fed. R. Crim. P. 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, Larry Freligh, with the concurrence of the defendant's attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

### *The Attack at the U.S. Capitol on January 6, 2021*

1. The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured twenty-four hours a day by U.S. Capitol Police (USCP). Restrictions around the Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the Capitol.

2. On January 6, 2021, the exterior plaza of the Capitol was closed to members of the public. The grounds around the Capitol were posted and cordoned off, and the entire area as well as the Capitol building itself were restricted as that term is used in Title 18, United States Code, Section 1752 due to the fact that the Vice President and the immediate family of the Vice President, among others, would be visiting the Capitol complex that day.

3. On January 6, 2021, a joint session of the United States Congress convened at the Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on Tuesday, November 3, 2020. The joint session began at approximately 1:00 PM. Shortly thereafter, by approximately 1:30 PM, the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4. As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the Capitol. Temporary and permanent barricades, as noted above, were in place around the exterior of the Capitol, and USCP officers were present and attempting to keep the crowd away from the Capitol and the proceedings underway inside.

5. At approximately 2:00 PM, certain individuals in the crowd forced their way through, up, and over the barricades. Officers of the USCP were forced to retreat and the crowd advanced to the exterior façade of the building. Officers with the D.C. Metropolitan Police Department were called to assist officers of the USCP who were then engaged in the performance of their official duties. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks as required by USCP officers or other authorized security officials.

6. At such time, the certification proceedings were still underway, and the exterior doors and windows of the Capitol were locked or otherwise secured. Members of the USCP attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after

2:00 PM, individuals in the crowd forced entry into the Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The riot resulted in substantial damage to the Capitol, requiring the expenditure of more than $2.9 million dollars for repairs.

7. Shortly thereafter, at approximately 2:20 PM, members of the House of Representatives and of the Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 PM on January 6, 2021. In light of the dangerous circumstances caused by the unlawful entry to the Capitol—including the danger posed by individuals who had entered the Capitol without any security screening or weapons check—Congressional proceedings could not resume until after every unauthorized occupant had been removed from or left the Capitol, and USCP confirmed that the building was secured. The proceedings resumed at approximately 8:00 PM after the building had been secured. Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### *The Defendant's Participation in the January 6, 2021, Capitol Riot*

8. On January 5, 2021, the defendant, Larry Freligh, and his friend, William Watson, drove from his home in Alabama to Washington, D.C., arriving on the morning of January 6, 2021. Freligh brought with him a backpack containing a spare set of clothes and a hunting knife with a blade approximately six inches long.

9. On January 6, 2021, Freligh and Watson attended the "Stop the Steal" rally held near the Ellipse, where he heard the former President speak. After the speech concluded, Freligh walked to the U.S. Capitol and crossed into the restricted portion of Capitol grounds. Freligh knew

that he was not authorized to enter the restricted area, and he knew that former Vice President Mike Pence was or would be visiting the Capitol that day as well.

10. At approximately 1:30 p.m., after entering onto U.S. Capitol grounds, Freligh approached to the Lower West Terrace area near the Capitol building, where he witnessed police fighting against rioters and deploying crowd control devices to disperse the crowd and keep them from reaching the Capitol building.

11. At approximately 2:13 p.m., Freligh used a metal bike rack to scale the wall of the Northwest Stairs, which led from the Lower West Terrace to the Northwest Terrace outside the first floor of the Capitol building.

12. At 2:18 p.m., Freligh reached the Senate Wing Door entryway of the U.S. Capitol building, which at the time was used as an emergency exit. Five minutes earlier, at 2:13 p.m., rioters had breached the entryway by smashing out windows to the left and right of the Senate Wing Door, climbing inside through them, and then kicking open the doorway. When Freligh entered that doorway minutes later, a loud, audible alarm blared overhead, and glass from the adjacent windows was on the ground inside and outside the doorway.

13. After entering the building, Freligh turned right and walked south toward the center of the building, filming on his phone. He reached the Crypt area of the Capitol—a large, circular room at the center of the Capitol building's first floor—then, after rioters overran a police line blocking their path, Freligh continued through the room to the Memorial Door staircase, which led to the second floor of the Capitol building.

14. At 2:33 p.m., Freligh entered the Rotunda area of the Capitol building, which is a large, circular room with a domed roof that stands at the center of the Capitol's second floor

between the House and Senate chambers. Freligh circled the room, pumped his fist in the air, then left the Rotunda.

15.     At 2:34 p.m., Freligh entered the suite of offices assigned to the Speaker of the House of Representatives, which at the time was Rep. Nancy Pelosi.

16.     At 2:36 p.m., as Capitol Police were able to direct rioters toward exits, Freligh exited through the Memorial Doors on the first floor of the building. However, at 2:41 p.m., when police opened the Memorial Doors to allow another small group of rioters to exit, Freligh used the opportunity to slip inside the doors as they closed and to reenter the building.

17.     Two officers immediately inside the doorway attempted to stop Freligh and force him to re-exit the building. Rioters about to exit the building were blocked from leaving by Freligh and the officers. As the officers spoke to Freligh and attempted to block his way, another rioter was able to reenter and move around the officers preoccupied by Freligh.

18.     Freligh then began to move past the first two officers, but a third officer shut the interior doors immediately inside the Memorial Doorway and blocked Freligh from moving further. Freligh pushed against the interior door held closed by the officer, then when another officer attempted to pull Freligh away from the door, Freligh resisted by putting his bodyweight against the door. During this period, other rioters attempted to reenter the building and those attempting to exit were blocked from leaving. The officer attempting to remove Freligh then quickly and forcibly pulled Freligh away from the interior door and ejected him from the building.

19.     Freligh then stood outside the doorway appearing to yell and gesture with his middle finger toward the officer who ejected him, until the officers closed and locked the doors, then began turning away individuals inside the Capitol attempting to exit through that doorway.

At 2:42 p.m., after other rioters walked away from the locked doors, Freligh returned and attempted to forcefully kick them open.

20. On Jan. 11, 2021, FBI arrested William Watson, with whom Freligh traveled to Washington, D.C., for criminal conduct committed at the Capitol on Jan. 6, 2021. When police arrived at Watson's premises, Watson texted Freligh, "They're here." Freligh then obtained a key to Watson's residence from a friend, and on January 13, 2021, Freligh and that friend went to Watson's residence to check on Watson's cats. On January 15, Freligh and the friend returned a second time to gather "stuff," including a cannister of OC spray that Watson obtained on Capitol grounds and had used to threaten police officers defending the building from other rioters. Freligh removed the OC cannister from Watson's home knowing that Watson obtained it at the U.S. Capitol. Freligh had the OC cannister in his possession when he was interviewed by officers and voluntarily provided it to them.

### *Elements of the Offense*

21. The parties agree that 18 U.S.C. § 1752(a)(2), Disorderly and Disruptive Conduct in a Restricted Building or Grounds, requires the following elements:

   a. First, the defendant engaged in disorderly or disruptive conduct in, or in proximity to, any restricted building or grounds.

   b. Second, the defendant did so knowingly, and with the intent to impede or disrupt the orderly conduct of Government business or official functions.

   c. Third, the defendant's conduct occurred when, or so that, his conduct in fact impeded or disrupted the orderly conduct of Government business or official functions.

## *Defendant's Acknowledgments*

22. The defendant knowingly and voluntarily admits to all the elements as set forth above. Specifically, the defendant admits that he knowingly engaged in disorderly and disruptive conduct in, or in proximity to, any restricted building or grounds, and that the defendant's conduct occurred when, or so that, his conduct in fact impeded or disrupted the orderly conduct of Government business or official functions. The defendant also admits that, when he entered and remained the Capitol's restricted area, he knew that the area was restricted and that Vice President Mike Pence was or would be visiting the Capitol that day.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: */s/ Hutton Marshall*
J. HUTTON MARSHALL
Assistant U.S. Attorney
U.S. Attorney's Office for the
District of Columbia
DC Bar No. 1721890
601 D Street, N.W.
Washington, D.C. 20579
(202) 809-2166
Joseph.hutton.marshall@usdoj.gov

## DEFENDANT'S ACKNOWLEDGMENT

I, Larry Freligh, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 8/14/24

Larry Freligh
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 8/14/24

Jon Q. Taylor
Attorney for Defendant