# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 24-cr-182 (TJK)** |
| **v.** | : | |
| | : | |
| **LARRY FRELIGH III,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Larry Freligh to 10 months of incarceration followed by 12 months of supervised release. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

## I.    Introduction

The defendant, Larry Freligh, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

On September 4, 2024, Frelich pled guilty to engaging in disruptive and disorderly conduct in a restricted building or grounds in violation of 18 U.S.C. § 1752(a)(2). The government's recommendation is supported by (1) Frelich's participation in the Capitol riot despite his acute awareness of his unlawful and disruptive presence gained by witnessing significant violence on the West Plaza and then scaling a wall to gain access to the Northwest Stairs, (2) his entry into the Capitol building through the Senate Wing Door at 2:18 p.m., just minutes after the initial breach of the building, (3) his aggressive physical confrontation with officers in attempting to re-enter the Capitol after initially exiting, and (4) his decision to forcefully kick an exterior Capitol door after officers resecured the entrance.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Frelich's crime support a sentence of 10 months of incarceration followed by 12 months of supervised release.

## II.    Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 20 (Statement of Offense).

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

*Defendant Freligh's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Larry Freligh and his associate William Watson drove from Alabama to Washington, D.C., arriving on the morning of January 6, 2021. Freligh brought with him a backpack containing a spare set of clothing and a hunting knife with a blade approximately six inches long.

After arriving, Freligh and Watson attended then-President Donald Trump's rally at the Ellipse near the White House, where he heard Trump speak about the Congress meeting nearby at the Capitol that day to certify the results of the 2020 presidential election. Trump told Freligh and others in the crowd: "If you don't fight like hell, you're not going to have a country anymore." After the speech concluded, Freligh walked to the Capitol and entered into the restricted perimeter established around the Capitol, knowing that he was not authorized to be in the area.

At approximately 1:30 p.m., half an hour after rioters first violently breached the restricted perimeter at the Peace Circle, Freligh was visible on U.S. Capitol Police ("USCP") closed-circuit video ("CCV") near a police line established on the West Plaza, where rioters fought police for over an hour to overrun the Capitol's defenses.



Images 1-2: CCV (main image) and open-source footage (inset) showing Frelich near West Plaza police line at approximately 1:30 p.m.

Immediately north of the West Plaza, scaffolding covered in white sheeting had been erected to provide seating for the presidential inauguration scheduled to take place later in the month. The scaffolding was erected over the Northwest Stairs, which provides access from the West Plaza to the immediate exterior of the first floor of the Capitol building. A small group of police officers guarded entry into the scaffolding at the base of the staircase, but at 1:48 p.m., rioters attacked and overran this line of officers, thereby gaining access to the Northwest Stairs. Frelich followed other rioters into the scaffolding.



*Image 3: Freligh moving with crowd toward scaffolding over the Northwest Stairs*

Open-source video shows Freligh briefly enter the scaffolding, then exit and circle around to the north to the marble wall running alongside the Northwest Stairs. At 2:13 p.m., Freligh and several others climbed up the wall using a metal bike rack placed against it as a makeshift ladder.



*Image 4: Freligh scaling wall alongside Northwest Stairs at 2:13 p.m.*

At 2:14 p.m., Freligh ascended the remainder of the Northwest Stairs—pausing midway up the stairs to help other rioters scaling the adjacent wall—and reached the first-floor exterior of the Capitol building.



*Image 5: Freligh pausing midway up Northwest Stairs to assist other rioters scaling Capitol building walls.*

After rioters reached the exterior of the first floor of the building via the Northwest Stairs, they used wooden planks, a stolen police shield, and other blunt objects to smash the windows to the left and right of the Senate Wing Door entryway. Rioters then crawled through the smashed-out windows and kicked open the Senate Wing Door. At approximately 2:13 p.m., the Capitol building was breached for the first time that day.

Freligh entered the building through this entryway minutes later, at 2:18 p.m. At the time he entered, a loud siren continuously rang inside the doorway.



*Image 6: Freligh approaching the Senate Wing Door at approximately 2:18 p.m.*



*Image 7: CCV capturing Freligh entering the Capitol building at approx. 2:18 p.m.*

After entering the building, Freligh turned north and walked toward the center of the building with other rioters as he filmed on his iPhone and raised his fist in the air.



*Image 8: Freligh walking with other rioters north from the Senate Wing Door toward the center of the Capitol building.*

Freligh then entered the large, circular room at the center of the Capitol building's first floor known as the Crypt, where rioters were amassing against a thin line of USCP officers blocking access to the remainder of the building. Freligh joined the crowd in chanting and pumping his fist in the direction of officers.





*Images 9-10: Freligh in the Crypt inside the Capitol building*

At approximately 2:25 p.m., the rioters in the Crypt overran this police line, and Freligh and others were able to push to the other side of the Crypt to reach the Memorial Door staircase. Freligh climbed this staircase to the second floor of the Capitol building.



*Image 11: Freligh ascending the Memorial Door Staircase.*

At approximately 2:33 p.m., Freligh entered the Rotunda—located at the middle of the Capitol on the second floor between the main entrances of the House and Senate Chambers— where he circled the room, shouted, and pumped his fist in the air, then walked back south out of the room.



*Image 12: Freligh in the Rotunda at approx. 2:33 p.m.*

Just outside the Rotunda was the entrance to the suite of offices dedicated to the Speaker of the House of Representatives, then Rep. Nancy Pelosi. Freligh entered the Speaker's suite at approximately 2:34 p.m.



*Image 13: Footage from the Hulu documentary, "24 Hours: Assault on the Capitol" showing Freligh at the entrance to the Speaker's suite*



*Image 14: Freligh inside the Speaker's suite at approx. 2:34 p.m.*

Freligh then returned to the first floor of the Capitol building using the Memorial Door Stairs, and at 2:36 p.m., Freligh exited the building through the Memorial Doors, for the first time.



*Image 15: Freligh initially exiting the Capitol building through the Memorial Doors at 2:36 p.m.*

Shortly after Freligh's initial exit from the Capitol building, USCP officers positioned themselves inside the Memorial Door entryway as they guided rioters out of the building and prevented those ejected from reentering. However, at 2:41 p.m., when police opened the Memorial Doors to allow a small group of rioters to exit, Freligh used the opportunity to slip inside the doors as they closed and reenter the building.

11



*Image 16: Freligh reentering the Capitol building at 2:41 p.m.*

Two officers immediately inside the doorway attempted to stop Freligh and force him to re-exit the building. Rioters about to exit the building were blocked from leaving by Freligh's actions and the officers intervening to stop him. As the officers spoke to Freligh and attempted to block his way, multiple other rioters followed in behind him, and one was able to reenter and move around the officers preoccupied by Freligh (but was stopped by a third officer shortly afterward).



*Image 17: Freligh (circled in red) being stopped by officers attempting to reenter the building as another rioter (circled in blue) moved around the officers preoccupied by Freligh.*

Freligh then began to move past the first two officers, but a third officer shut the interior doors immediately inside the Memorial Doorway and blocked Freligh from moving further. Freligh pushed against the interior door held closed by the officer, then when another officer attempted to pull Freligh away from the door, Freligh leaned his bodyweight against the door to resist officers' attempts to move him. During this period, other rioters attempted to reenter the building and those attempting to exit were blocked from leaving.



*Image 18: Freligh leaning against an interior door held closed by an officer as a second officer attempts to pull him toward the exit.*

The officer attempting to remove Freligh then quickly and forcibly pulled Freligh away from the interior door and ejected him from the building.



*Image 19: Freligh being forcibly removed from the building at approximately 2:42 p.m.*

Freligh then stood outside the doorway aggressively yelling and gesturing with his middle finger toward the officer who ejected him, until the officers closed and locked the doors, then began turning away individuals inside the Capitol attempting to exit through that doorway. At 2:42 p.m., after other rioters walked away from the locked doors, Freligh returned and attempted to forcefully kick them open.



*Image 23: Freligh attempting to kick Memorial Doors open after being forcibly removed from the Capitol building.*

*Freligh's Interview with the FBI*

On January 19, 2021, Freligh voluntarily spoke to FBI agents about his and Watson's activities on January 6, 2021. Freligh admitted to entering the U.S. Capitol building that day. Freligh blamed the riot on the police defending the Capitol that day, stating that peaceful demonstrators turned violent when he saw "innocent people getting tear-gassed and shot with rubber bullets."

Freligh also admitted that on January 11, when authorities placed Watson under arrest for his conduct on January 6, Freligh admitted receiving a text message from Watson that day that read, "They're here." Freligh obtained a key to Watson's residence from a friend, and on January 13, 2021, Freligh and that friend went to the residence to check on Watson's cats. On January 15, they returned to the residence to gather "stuff," including gaming equipment and a cannister of mace that Watson had obtained on Capitol grounds and used at one point to threaten police officers defending the building from rioters. Freligh stated that it was his friend that took the mace, but Freligh then provided agents with the mace in question.

*The Charges and Plea Agreement*

On April 11, 2024, the United States charged Freligh by a four-count Information with violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). On September 4, 2024, pursuant to a plea agreement, Freligh pleaded guilty to Count Two of the Information, charging him with Disorderly and Disruptive Conduct in a Restricted Building or Ground, in violation of a violation of 18 U.S.C. § 1752(a)(2). By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Freligh now faces a sentencing for violating 18 U.S.C. § 1752(a)(2). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to one year of imprisonment, one year of supervised release, and a fine of up to $100,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR.

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2A2.4(a)) | 10 |
| Specific Offense Characteristics (U.S.S.G. §2A2.4(b)(1)(A)) | +3 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | <u>-2</u> |
| Total Adjusted Offense Level | 11 |

*See* PSR at ¶¶ 35-45. Furthermore, this calculation tracks what the parties agreed to in the plea agreement. Plea Agreement, ¶ 5.

U.S.S.G. § 4C1.1 provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. As the parties agreed in the Plea Agreement, Freligh is ineligible for a reduction under § 4C1.1 because he used violence

16

or credible threats of violence in connection with the offense.

The U.S. Probation Office calculated Freligh's criminal history category to be I. PSR at ¶ 48. Accordingly, the U.S. Probation Office calculated Freligh's total adjusted offense level, after acceptance, at 11, and his corresponding Guidelines imprisonment range at 8-14 months. PSR at ¶¶ 85. Freligh's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 10 months of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Freligh's

participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.

The two most significant factors in Freligh's case are the timing, place, and manner of his approach and entry into the Capitol building and his aggressive physical confrontation with multiple officers attempting to reenter the Capitol building. First, Freligh's initial approach through the West Plaza and up the Northwest Stairs made it abundantly clear not just that he was not permitted to be present in the area, but just how disruptive his presence was. He joined the crowd as it overran police line after police line on the Northwest Stairs—which he scaled using an upturned bike rack—then entered the Capitol building just five minutes after its initial breach, where blaring alarms, shattered windows and other markers of the riot's destruction would have been obvious to him.

Freligh's attempted reentry to the building is another significant aggravating factor here. Immediately prior to his entry, rioters were exiting through the Memorial Doors manned by two officers. After Freligh forced his way inside the doorway, multiple others followed his lead, blocking other rioters from exiting the building and causing a third officer to respond to assist in blocking Freligh. After Freligh was ejected from the building by the officers—as he continued to yell and gesture aggressively at them—the officers responded to the chaos created by Freligh by closing the doorway entirely, forcing them to guide rioters to another point of egress within the building. Not only was Freligh's conduct brazen confrontational and unlawful, his actions disrupted officers' ability to adequately respond to the ongoing crisis inside the Capitol building.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 10 months of incarceration in this matter.

### B.  Freligh's History and Characteristics

Freligh is 28 years old and works as a plumber and pipefitter in Montgomery, Alabama. He reported no current physical, mental, or substance abuse issues, nor any that were ongoing on January 6, 2021. Further, unlike many criminal defendants that appear before this Court for sentencing, Freligh had the benefit of being supported and well cared for throughout his childhood and adolescence, yet he still chose to join in the violent disruption of Congress's Joint Session on Jan. 6, 2021. Accordingly, there are no special considerations here which weigh against a sentence within his recommended Guidelines range.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a Guidelines range term of incarceration. Although Freligh admitted to FBI to entering the Capitol on January 6, was cooperative during the investigation, and accepted responsibility by pleading guilty, he has expressed no remorse for his conduct and has instead deflected blame on police, rather than the rioters, for the ensuing violence. This Court should accordingly be skeptical of an expression of remorse by Freligh for the first time at sentencing. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

### E.  The Need to Avoid Unwarranted Sentencing Disparities

The sentencing factors set forth in 18 U.S.C. § 3553(a) also instruct sentencing courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[2] This Court must sentence Freligh based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Stephen Roy Sexton*, 23-cr-228 (TSC), the defendant entered onto the West Plaza and eventually reached the Lower West Terrace immediately adjacent to the tunnel, where he remained for multiple hours and entered into the Capitol building through a broken window immediately adjacent to the tunnel. Inside, Sexton engaged in two discrete acts of property damage, breaking the leg off a wooden table and briefly attempting to pull a door off its hinges. Sexton pled guilty to 18 U.S.C. § 1752(a)(2) and a misdemeanor 18 U.S.C. § 1361. The Court

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

calculated Sexton's guidelines range to be the same as Freligh's—8 to 14 months—and sentenced him to 8 months.

There are multiple aspects of Freligh's conduct that are more serious than that of Sexton. First, while Sexton entered into a single conference room that had appeared to have already been evacuated, Freligh paraded through the center of the building with other rioters, even reaching then-House Speaker Nancy Pelosi's office suite. Second, while Sexton did not directly encounter police officers at the Capitol, Freligh deliberately engaged in a physical confrontation with them while trying to break back into the Capitol building after exiting. While Sexton pled guilty to an additional misdemeanor offense, had multiple past convictions, and obstructed justice during the course of the investigation, Freligh's much earlier entry through the building at a significant breach point and his physical confrontation with officers are aggravating factors absent from Sexton, supporting an equally high or higher sentence of incarceration.

In *United States v. Joshua Knowles*, 22-cr-297 (TJK), the defendant entered the Capitol building through the Senate Wing Door on the west side of the building at 3:13 p.m. and remained inside for 9 minutes, exiting through the same door at 3:22 p.m. after entering the Crypt. After exiting, Knowles circled around to the North Door, where he joined other rioters fighting to enter the building, ultimately retreating after pepper spray and a fire extinguisher were dispersed near the doorway. Knowles pled guilty to violating 18 U.S.C. § 1752(a)(2), and this Court sentenced him to seven months of incarceration.

Knowles's conduct is comparable to Freligh's in several respects. Both men entered the Capitol through the same doorway after witnessing significant violence on the west front, and notably, both men unsuccessfully attempted to reenter the building a second time. However, Freligh's attempted reentry was more violent: he engaged in a deliberate physical struggle with

22

three officers and disrupted and frustrated their efforts to restore order. Moreover, Freligh's attempted reentry appeared to result in officers having to shut the doorway entirely instead of continuing to shepherd rioters out of the Capitol building. Thus, despite Knowles's braggadocios texts and online statements before and after entering the building, Freligh's conduct warrants a higher sentence than the seven months of incarceration Knowles received.

Finally, Freligh's conduct is also more serious than the defendant's conduct in *United States v. Bradshaw*, 23-cr-220 (TJK). While Bradshaw may have also had a physical altercation with police on January 6—grabbing an officer's baton on the West Plaza—Freligh's conduct was both more assaultive and more consequential: it took multiple officers to force Freligh back out of the doorway through which he was attempting to reenter, and they were forced to close the doorway entirely after that point (while Freligh continued to yell at the officers, and then kick at the door once they closed it). Bradshaw received consideration from this Court for appearing to attempt to quell other rioters at certain points; Freligh, on the other hand, brazenly attempting to force his way past officers and then continue to aggressively confront them as other rioters exited the building. While this Court sentenced Bradshaw to four months of incarceration, a sentence of 10 months of incarceration is warranted for Freligh.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v.*

*Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[3] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Freligh must pay $500 in restitution, which reflects in part the role Freligh played in the riot on January 6.[4] Plea Agreement at ¶ 12. As the plea agreement

---

[3] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

[4] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can

reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Freligh's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 12.

## VII.    Fine

The defendant's conviction for violating 18 U.S.C. § 1752(a)(2) subject him to a statutory maximum fine of 100,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $4,000 to $40,000. U.S.S.G. § 5E1.2(c).

---

be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 10 months of incarceration, 12 months of supervised release, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Freligh's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Hutton Marshall*
J. HUTTON MARSHALL
Assistant U.S. Attorney
U.S. Attorney's Office for the
District of Columbia
DC Bar No. 1721890
601 D Street N.W.
Washington, D.C. 20579
(202) 809-2166
Joseph.hutton.marshall@usdoj.gov